Case number 241292 and 24-1300 Kim Hodges v. Joseph Abram et al. 15 minutes to be shared by the appellants. 15 minutes for the appellee. Mr. Youngdahl, you may proceed for the appellant. Good morning, Your Honor. Good morning. Good morning, Your Honor. As it may please the court, my name is Neil Youngdahl. I represent defendants Braxton Crowder, Jason Kelly, Warren Hanson, Alex Fox, and Jason Merveau, who are collectively referred to as the Kent County defendants. I'm splitting my time today with counsel for defendant Stephen Dumond. I intend to speak for six minutes with a two-minute rebuttal. In order to prevail in this appeal, a plaintiff must establish three things. First, that at the time of his arrest, Mr. Molson had a sufficiently serious medical need as defined by this court's precedent. Second, that the officers responded unreasonably to that need. And third, that the law clearly established at the time of the arrest that the officer's decision to transport Mr. Molson to jail rather than a hospital was unconstitutional. As explained in length in our brief, plaintiff can't meet any of these three necessary prerequisites for her deliberate indifference claim, so this court must reverse the district court's denial of qualified immunity. Unless this court has specific questions for me, I plan to spend my limited time here today focusing on one aspect of the clearly established analysis and one aspect of the objective serious medical need analysis. On the clearly established prong, plaintiff admits that she is proceeding under the obvious case path. The Supreme Court has acknowledged that obvious cases are rare and that in the majority of cases, plaintiffs will need to point to a developed body of case law or binding on-point precedent to carry their burden at the clearly established stage. This is not an obvious case for a few reasons. One of the most important, which I believe, is that a survey of the case law in effect at the time of Mr. Molson's arrest affirmatively indicates that arresting officers generally do not violate any constitutional rights when they choose to take a detainee to jail rather than a hospital, even in cases where the detainee exhibits some symptoms of medical distress. This is because police officers, arresting officers have no reason to doubt that reasonable measures will be taken at the jail, including with respect to medical screening. This court recognized that principle in Arrington Bay. In further support of this point, I direct the court to pages 33 to 37 of our brief, which provide the survey of case law that indicates officers don't violate the constitution by taking detainees to jail. I would specifically point to the Fourth Circuit's decision in Brown v. Middleton because it has materially indistinguishable facts from this case. In both cases, a bag of crack cocaine was removed. They testify that they see him putting something in his mouth, and they force him to regurgitate, and he regurgitates something. At that point, why is there no assumption or possibility that he could have swallowed something else? I don't know whether – but I'm just saying under those circumstances. Yep, and so I think this question also touches on the sufficiently serious medical need, which is that the medical need has to be obvious to the police officers at the time. And so first off, this idea that because he spit out a bag of crack cocaine that he would have maybe perhaps swallowed it requires an inference. That's not obvious that just because you spit something out that maybe there was a second bag that you might have swallowed. Can I interrupt you for a second because I noticed in your briefing you also said spitting out. But as I understand it, this involved an officer really manipulating his Adam's apple to make him expel what was in his throat, correct?  So – which is not – I don't view that as spitting out. It doesn't sound like it was a volitional act on Hodge's part, right? Mr. Molson, but yes. Molson, I'm sorry. Yeah, I don't put any weight on my description of it as spitting out. Okay. Well, the reason that I ask that is because I circle back to Judge Nalbandian's question. This is a swallowing case. These are officers. So these are not just random folks out on the street. If you've swallowed one bag, is it – would a reasonable officer believe that, oh, okay, he got it out of his throat, we're done? Well, that's not what happened here. So the police officers asked him, did you swallow anything? He repeatedly said no. He denied it multiple times. He denied it multiple times. He did not exhibit any symptoms. Anything was wrong. At that point, the officers then took him to jail where they had no reason to doubt that the jail would provide reasonable procedures in response to whatever medical needs Mr. Molson had. So it's not obvious that one who has swallowed one bag might have something in their stomach too? It's not obvious. And I would also like to point out, Your Honor, and again this goes to the objective prong of the deliberate indifference case, the plaintiff has said that she is proceeding down the path that requires her to demonstrate that the medical need was so obvious that even a lay person would have easily recognized the need for – Ordinarily, if death occurs, then that is the case. But – go ahead. If death occurs and there are objective indications that the defendant is in – or I'm sorry, that the detainee is in medical distress, that's what Burwell says on that point. And so I would – but circling back to the objective prong, hopefully to respond to your question, that analysis is done from the perspective of a lay person. So the – and this is part of a problem with plaintiff's response to that is that they cite to expert testimony. But if they have to cite to expert testimony in order to substantiate their argument, that's necessarily not obvious from the perspective of a lay person. And lay person from that perspective means a non-medical person, not a non-officer, right? Yes. Okay. So I see that my time has run out. Unless this Court has further questions for me, we'd ask the Court to reverse. Thank you. May it please the Court, Mary Massaran on behalf of Detective Dumond. We'll also be reserving two minutes for rebuttal. The question is whether Detective Dumond is protected, along with the other officers, with qualified immunity from a claim that he was deliberately indifferent to the serious medical needs of Molson. And in order to make the showing that's required here, plaintiff would have to show that Dumond – that a reasonable officer would have known an excessive risk of force based on obvious medical needs. Dumond's testimony here is that Molson exhibited no signs of being high. He was coherent. He engaged in a conversation. In fact, he admitted to multiple other crimes, suggesting that he wasn't thinking about hiding. At that point, he was trying to set up a relationship with the police that would reduce his sentence for whatever he was going to be charged with. And Molson knew that Molson was on the scene and involved the shortest amount of anyone. He was there at the point of the arrest. He's the one that agitated – excuse me, Dumond was the one who agitated Molson's throat. And he had this conversation with Molson in which he was saying, you know, maybe you could be an informant. And he asked Molson repeatedly if he had swallowed anything else. Molson told him no. Based on that, he concluded – did not believe there was a serious medical need or that Molson necessarily had swallowed an additional bag. Also, the officer who had told him Molson had tried to swallow something saw one hand motion to the mouth, which would also suggest there was one bag which was forced to be expelled, all of which would have given a reasonable officer sense that there was nothing further to be done except transporting to the jail and the jail, which would have a medical intake procedure, including medical personnel who could do a further evaluation. I'm not aware of any case from this court or any court that suggests in that circumstance that the officer who was on the scene has some duty to make sure that the detainee goes to the hospital. And I think it's important to keep in mind what plaintiff is really asking. What about the Gomez case? Pardon me? Gomez? Are you aware of that case? I'm sure I read it, and now I'm blanking on it. I apologize. But let me say this in terms of what is being asked for here, a rule that every time there is even a possibility that a suspect might have tried to swallow drugs, they'd be taken to a hospital where... But that's not their argument, right? I mean, that's not the rule they want. Well, they... In this particular circumstance, they had seen him swallow...  And the question is, what else can you infer from that? Can you infer that, hey, maybe he has something else in his stomach? Well, I think the whole idea, is there a possibility he has something else in his stomach? I don't think that's enough. Well, it's not like any person in this room might have something else in their stomach. It's like somebody who just ingested drugs. Is it possible that that person also has drugs in their stomach? I mean, it kind of narrows down. It's not just anybody. What I think is crucial are two things. One is, given all of this evidence that they saw one hand motion to his mouth, he was forced to expel that baggie. He repeatedly denied having ingested drugs and having drugs beyond that baggie. He showed no visible signs of being under the influence. No sweating, no pupil dilation, nothing that you would expect. Even in the face of all of that, and even in qualified immunities, broad protection for reasonable mistakes of fact, plaintiff wants this court to announce a rule that they would have my guy, who wasn't even the transporting officer, would have been required to make sure he went to a hospital. Whereas, as the affidavit that was filed with one of the briefs in support of summary judgment said, a hospital wouldn't do anything. Because what they're asking for is an invasive procedure. Endoscopy is an invasive procedure done under a general anesthetic. This guy has a right to bodily integrity. He says, I don't have any drugs. Counselor, you might want to start the warning bell. Thank you. Thank you. Good afternoon, Your Honors. Christopher Desmond from Johnson Law on behalf of the plaintiff, Kim Hodges, who's the personal representative of the estate of Michael Molson. Your Honors, I want to start with the factual record here a little bit, because I think we're doing this case a disservice to just describe it. Also, this notion that he repeatedly denied that he had taken anything additional. It's true that Mr. Molson does have denials to Officer Dumond when they're having a conversation, but I think if we look at Judge Beckering's opinion, Judge Beckering describes how Mr. Molson initially was very resistant to interacting with these officers. When he gets out of the car, they've already seen him putting something toward his mouth and attempting to swallow. They're screaming at him to spit it out, and he's doing nothing in response to that. They have to physically force him onto a car, massage his Adam's apple. After he spits out that bag, Judge Beckering describes how they continue to ask him, do you have anything else in your mouth? He's not saying no at first. He's not responding to the officers at all. He eventually does start to make denials to the officers, but this is certainly a situation where these officers have seen that my client had an intent and an ability to swallow narcotics. But what are they supposed to do? So they ask him, did you swallow anything else? And he says no. Okay, I understand it's after a while, but he does say no. So are they supposed to say, I don't believe you, I'm taking you to the hospital, and what, we're going to do an invasive procedure to see whether there's something? I mean, what if he hadn't swallowed anything else? They do some invasive procedure, they don't find anything, and he sues them for excessive force? Sure. I mean, I don't understand what they're supposed to do. I'll tell you, Your Honor, someone who does excessive force cases, I can't imagine an attorney who's going to take that case because they're going to acknowledge that there's a reason. I can't. Well, maybe. I guess there's always someone. But, you know, it's certainly not the fact pattern that we're presented with, and I understand the concern about. But doesn't it go to the, but doesn't that, I understand that's not the fact pattern, but doesn't that kind of go to what you're, you know, we're concerned with what's clearly established, what the rules are that govern police conduct, and I'm curious what your, how is this supposed to play out? What were they supposed to do? I mean, they did eventually, you know, at the jail, you know, after the mom calls, and then they, you know, then they do some more investigation. Now, I noticed you hadn't sued anybody other than these officers, right? You haven't sued anybody that was involved in making determinations about treatment at the jail, right? Correct, Your Honor. I mean, you know, whether the scan that they performed was the right thing to do I think is maybe questionable, but they're not being sued, so I don't know. So all we're doing is looking at these officers, and I'm still confused. What are they supposed to do? Just drive them to the hospital and say, lay down here, we're going to put this thing down your throat, and we're going to figure out. So first of all, and this might be a minor point, and I don't mean to quibble, I'm not conceding that it involves doing an endoscopy where they have to do an investigation. Okay, okay. Maybe they can use this other kind of scan. Right, right. That's what our expert, Mr. Simpson, Dr. Simpson, has said, is that it would be a different kind of scan.  So I don't think that's what's required. But, yes, I do think that they were obligated to take him to a hospital for medical treatment, and I think part of that comes. And the reason for that is what? What's that? And the reason for that is what? Because of his demonstration of his lack of ability and willingness to be honest with the police officers about whether he swallowed narcotics. They already know that this is an individual who is risking his life to avoid criminal prosecution by swallowing that first bag, not trying to swallow it. He had it in his throat, and so they already know that. This idea that, well, he's not exhibiting symptoms of intoxication, well, sure, because the narcotics are in a bag, and they're aware that the narcotics that he previously tried to swallow are in a bag. And so it's going to take some time for those pills or that piece of crack cocaine to get into his system and cause those symptoms. They don't have the luxury of waiting around until those symptoms exhibit themselves. They have to make emergent medical decisions at that point. I think his health and well-being would be more important than hiding drugs. What's occurred here, you've got a suspect who's denied that he has any other packets of drugs in his system, and he's not exhibiting any symptoms. They take him to the jail, and there's further medical screening there. They even took an x-ray, and the x-ray didn't indicate the presence of any more of these bags in his body, anything like that. So that being the case, it's sort of difficult to say that the police did anything wrong here. Well, Your Honor, when we say that you would think that he would value his health and safety over the idea of hiding drugs, if that was true, he wouldn't have tried to swallow the first bag, and he wouldn't have denied it when they were trying to get that first bag out of his throat. Well, he's entitled to put his life in jeopardy if that's what he chooses to do. Criminal behavior is so paramount for him that he's going to conceal and lie and risk his life. That's not on the officers. I respectfully disagree with that, Your Honor. I think that's precisely what a fairly substantial branch of our deliberate indifference case law is about. It's about this idea that once you have someone in your custody, in your care as the defendant, there are going to be moments, and we see this most often. We see it in our drug overdose cases. We also see it in our suicide cases. We see instances where an individual intends to harm themselves or make a poor decision, and quite frankly, that's why a lot of these people in deliberate indifference cases are in custody to begin with. They're individuals who make poor decisions. Does the officer have any reason to believe that this was an individual who was going through a mental health crisis or was mentally or emotionally incompetent for some reason? No, I don't believe so, Your Honor. And he wasn't a minor or underage or anything like that, was he? No, Your Honor, he wasn't. He was simply an individual who had demonstrated to these officers that I will swallow narcotics in order to avoid the criminal ramifications of what I've done. And what I would also say is that just from a pure jurisdiction standpoint, and we argue this in our brief and it comes from the Mitchell v. Forsythe decision from the U.S. Supreme Court, they're bound to take that factual record that Judge Beckering describes in her opinion. To the extent that they want to have an interlocutory appeal based on qualified immunity, they can't argue about those facts. They can't argue that Mr. Molson was just this compliant individual who, once he spit out drugs, starts working with the police and starts dealing with them honestly. What Judge Beckering shows is that's not the case. This is an individual who is resisting all sorts of contact and interaction. But there's a case that clearly establishes that what they did was wrong. So from a clear... The judge's analysis, I have to say, was at a very high level of generality, which is not what we're looking for usually. And we have cases like Watkins where we've granted qualified immunity, where somebody was asked whether they ingested drugs and there were a lot of objective indicia that maybe they had, and we still granted qualified immunity. So what is the case that we should look at? So the case that I think this court should look at, and I understand why opposing counsel is going to push back against this, but is the Burwell decision. And what I think is really interesting, I'm going to point the court to two different decisions, one from this court, one from the Supreme Court. The Supreme Court is the Mullinex decision, and this court is Burwell. I cite to Mullinex because Mullinex is a Supreme Court decision that predates this court's decision in Burwell by, I believe, about six or seven years. Mullinex is the case where I think this court has taken a lot of its jurisprudence about clearly established and the level of specificity that we need. Mullinex is a Fourth Amendment case. It's an excessive force case. And in that case, this court will see the U.S. Supreme Court is talking about how, because uses of force are such fact-specific determinations, we need to make sure that officers had seen a sufficiently similar case in the past. But they're not talking about deliberate indifference. They're not talking about Eighth or Fourteenth Amendment jurisprudence. If this court looks at what it did in Burwell in 2021, so this is after Mullinex has come out, in Burwell, this court didn't go through and look for a prior identical drug overdose case. What it did was it talked about how, beginning in the 1970s, continuing in the 1980s, this court recognized that there's a clearly established right to get medical care when a jailer or someone who's detaining you has reason to know that you're facing a medical emergency. They did it at a broader level. And so I think it was wholly appropriate for the district court to use that broader level. Whether you want to put the term on it and say that I'm taking the obvious route, we can do that. We can say the obvious route. Well, I mean, I guess I would say we have drug ingestion cases. So I don't know why. Wouldn't we look to those as the first line? Well, and Burwell is a drug ingestion case. Burwell is. It's a drug overdose case. It's a different kind of case than this case because in Burwell, it was a case where they had started to see symptoms as opposed to seeing conduct. The guy was symptomatic, I think. He was. I mean, that puts you on note. I mean, that seems to me. But, okay, I understand your point. Yeah, yeah. And I agree, Your Honor. It is different if someone has taken drugs. You haven't seen someone take drugs but they're symptomatic versus you've seen someone try to swallow drugs and they're not symptomatic. They're different. But in both instances, I think that there's reason for an officer to believe that, you know, I need to do something here. And I think part of that comes from, you know, if we look at Farmer versus Brennan and we look at, I think it was this court's decision in Comstock, you know, courts talk about recklessness when they're talking about these deliberate indifference cases. And they talk about recklessly disregarding known risks and suspicions. It talks about how you don't have to intend to actually injure the individual. You don't have to ignore them in every way. So I'm not contending that these officers, you know, wanted my client to overdose and that they were just looking for him to rubber stamp their decision to not take him to the hospital. I don't believe that that's what's happening. But it's also not what I have to show. All I have to show is that there was a reckless disregard here. And, you know, in a weird way, I think the fact that they continue to ask the question, right? If they're so satisfied that Mr. Molson didn't swallow an additional bag of drugs, why are they asking him over and over and over and over? They're asking him because they have reason to suspect. It's very perverse to kind of punish them for doing that. I mean, especially in a case like Watkins where we said, hey, look, they asked him. I mean, this was something that showed them that they cared about this guy and asked him, hey, did you swallow anything more? I mean, at some point, I guess it goes back to Judge Clay's point. I mean, there is some responsibility on the person who's being asked, did you swallow something toxic? So obviously, Your Honor, my client through his death has dealt with the consequences of that action, and there were consequences of that action. But I think the second that we start to say, well, if a governmental defendant simply asks the question, that satisfies their burden, or if they ask the question four times, that satisfies their burden. I just don't think that that's what our deliberate indifference case law says. And sometimes it's not in the context of drugs. Sometimes it can be someone is in their cell and a guard is asking them over and over, you don't look good, do you need help? And they say, no, I don't. The fact that they say, no, I don't, isn't what determines it. These are individuals, like I said, these are individuals who are in custody because of their inability to make proper decisions. Can I back you up for a second? Yes, Your Honor. This is going to take you way back. The defendants argue that you don't even get past the objective prompt. Yeah, yeah. Do you want to speak to that? Yeah. So as you said, Your Honor, and I think this is firmly supported by the Burwell decision, generally when we have death, we satisfy that prompt. I think there has been this weird sort of intermingling between the objective and subjective prompts in deliberate indifference. But we have here, we have a death, and so I think we can satisfy it through that prompt. But I also think we satisfy it through them seeing my client trying to swallow something and knowing that he had actually had something lodged in his throat. I think that they know at that point this is an emergency that we have to do something about. The conduct, I think, is what informs it. You know, it's similar to if when they pulled up they saw my client sitting in his car drinking out of a gallon container of bleach. Maybe that bleach, the effects of it haven't hit yet. But they see him engaging in reckless conduct that they know if this goes bad, it can go bad quickly. We need to make sure he's in the proper place getting medical care. I think it's similar to that. Can I ask you a question about the death? Yes. If they hadn't seen him swallow anything but he had swallowed something and then died, would the objective prong be met? If they hadn't seen him at all. Yeah, Your Honor, I think it would be. But, again, I think that is where I struggle with this court's jurisprudence on this difference between objective and subjective. Because the way that I read initial cases, and I don't mean to take us far astray from where we were. It's got to be an obvious medical need, right? I mean, obvious, how is it obvious? It does, but I think that that's where we push more into the subjective prong. Because Farmer v. Brennan talks about, and it does this when it's talking about the subjective prong, there's a statement in Farmer v. Brennan where it says, a plaintiff can prove the subjective prong in all the usual ways, including showing that it would be obvious to a layperson that medical care was necessary. And so I think we've kind of muddled those things together. But from the statements in Burwell, and I get that Burwell has some distinguishing facts, but the statements are in Burwell that when we have a death, we generally satisfy that prong. So, yes, Your Honor, I think, I'll put it this way. I would not be enjoying arguing this case as much if those were the facts that I was dealing with, that they saw nothing. I know you're out of time, but one last question. Once the officers incarcerate your client in jail and they do a little more medical screening and that they, among other things, take an X-ray, and the X-ray doesn't show anything, doesn't show any drugs in his body, why isn't that something that then insulates the officers from any further liability at that point? Combining the absence of anything on the X-ray with his denials and all the other factual background. Sure, I'd say a couple reasons, Judge Clay. I think, first of all, I don't think there's any evidence in this record that any of these defendants were essentially deferring to that X-ray, meaning that they were waiting to see what are the results of that before we decide what we're going to do. These are two separate steps in the fact. Yeah, but doesn't there have to be some causation here for there to be civil liability on behalf of these officers? For example, if taking them to the hospital wouldn't have saved them, then you really wouldn't have a cause of action in any event. I agree with you on half of that, Judge Clay. Yes, I wouldn't have a cause of action if it wouldn't have made a difference. I think the record shows that it would have made a difference, and this comes from our expert, Dr. Simpson. He explains that the scan that they did in the jail is a scan that's designed to detect things like weapons. It's not a scan that would have detected narcotics. It's not capable of doing that. And so he indicates that something like a fluoroscope or an endoscope, which is the appropriate test for when you're trying to detect narcotics, they do a scan there, but that is a scan that's not specific to, oh, we suspect there could be narcotics in your stomach, so this is the scan that's proper for that. It simply would not have detected it. So that would be my response. Thank you very much for your time today. Thank you. I appreciate it. Your Honor, in my limited time here, I just want to be clear about what exactly my clients did hear and where they took him. So when they saw him make the hand movement to his mouth, they immediately intervened. They asked him whether he had swallowed drugs. He denied it. That's viewing the facts in the light most favorable to plaintiff. They then took him to the Kent County Correctional Facility, which is on the spectrum of jails a fairly sophisticated facility. They have on-staff medical personnel. They have a medical clinic there. When he got there, the medical staff did a screening of him where all of his vital signs were normal. They asked him if anything was wrong. He said no. Medical staff cleared him. He went to the jail. Plaintiff then called the jail and said, hey, he swallowed drugs. I think he swallowed drugs. So they pulled him back out of his cell. They did a second medical exam under which they had specific knowledge of this risk, and then they did an x-ray. Under this court's precedent, and after all of that, the medical personnel were not able to identify any medical need on Mr. Molson's behalf. Under this court's precedent, specifically Spears and Trozzi, that determination means as a matter of law that the medical need was not sufficiently obvious. But the later stuff like the scan, that doesn't affect your clients, does it? It affects the reasonableness. Because, by the way, I'm not sure the scan was, I mean, if somebody was deliberately indifferent in this case, I'm not, I'm thinking maybe the people that decided that, you know, if we think there's a bag of drugs in there, I'm not sure why we're doing a scan for, you know, items or, you know, metal items. So I know I'm running short on time. I've got three responses to that really quickly. So first, it goes to the reasonableness of my client's decisions to take him to jail. So they took him to essentially a medical clinic. The plaintiff believes they should have taken him to a hospital. I don't think there's a distinction between those two things. And then second, I would also like to echo a point that was already made today, which is they have not sued the medical personnel. So if there's some determination that that wasn't sufficient, that's maybe a different case. And then third, you know, opposing counsel brought up their expert. I would just note that their expert is not an expert in medical room procedures. I don't remember his exact title, but I think he's like a pharmacologist that talks about, you know, perhaps the effect of drug systems on people's system. And so our expert who testified to what would actually happen in an emergency room, who is actually an emergency room doctor, testified that he would not have received any more or different care at a hospital than he did at the medical clinic. For these reasons, we would ask this court to reverse. Just about two points. The plaintiff is trying to skip a step in the analysis by conflating the question of obviousness, which is part of the objective test, with the question of the seriousness of the risk. And that's a problem. The seriousness of the risk, you could say, well, what is the seriousness of a risk of a bag of cocaine being ingested? And we could all agree that would be serious. That's a different question, still part of the objective analysis, about whether it would be obvious to a lay officer. And here, because of the denials, because of the absence of any signs of drugs, it wouldn't be obvious. So it seems to me even on the objective prong of the test, the officers should be entitled to qualified immunity. And then finally, with respect to the qualified immunity clearly established law, we put an entire section in our brief about the strictness, which we believe the Supreme Court is approaching these cases. And certainly, even under the cases in this court's longstanding approach, it's not enough to have a general rule. Finally, Burwell was decided on March 4th, 2021. Plaintiff's arrest took place on January 20th, 21. And therefore, Burwell postdates the arrest. So for purposes of finding a case, Burwell can't be the case. We think Burwell supports us in any event. But I did want to make that clear to the court. We think the cases like Spears and Watkins are the closest cases on the facts, and they would support a reversal. I'm happy to answer questions. I think we have your argument in hand. Thank you very much. And thank you for your arguments on both sides. The case is submitted.